IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY                                                              PLAINTIFF

V.                            CASE NO. 3:23-CV-3026

THE EUREKA SPRINGS CITY ADVERTISING
AND PROMOTIONAL COMMITTEE; CAROL WRIGHT;
JEFF CARTER; JAMES DEVITO; HARRY MEYER;
MELISSA GREEN; PATRICK BURNETT; THE CITY
OF EUREKA SPRINGS, ARKANSAS; BUTCH BERRY;
KIM STRYKER; LACY ECKBERG; TRACY JOHNSON;
GINA RAMBO; JAMES R. "RICK" BRIGHT; GREG MOON;
KAREN PRYOR; and LONNIE CLARK                                            DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER</u>

Now before the Court is Plaintiff State Automobile Mutual Insurance Company's

Motion for Summary Judgment (Doc. 50). In this Declaratory Judgment Action, State

Automobile Mutual Insurance Company ("State Auto") seeks a declaration that it has no

duty to defend or indemnify certain Defendants in an underlying state-court action. The

Motion is fully briefed and ripe for review. For the reasons stated in this Order, State Auto's

Motion for Summary Judgment is **GRANTED**.

## I.  BACKGROUND

### A.  Factual History

As the Court has previously remarked, the factual history of this case is rather

tumultuous. Put simply, it involves several months of in-fighting amongst the members

and employees of the Eureka Springs City Advertising and Promotional Committee

("CAPC"). The CAPC is a commission of the City of Eureka Springs that promotes the

city and manages fiscal and financial affairs associated with the collection of CAPC taxes

1

from Eureka Springs businesses. The in-fighting began as early as 2019 and peaked in early 2021 when certain CAPC members and employees were ousted from their positions via an alleged drawn-out smear campaign. Those who were removed sued the City, the CAPC, its remaining commissioners, and the Mayor in the Circuit Court of Carroll County, Arkansas for various claims described below.

The CAPC is insured by State Auto. State Auto filed suit in this Court seeking a declaratory judgment that the Policy does not afford coverage to the CAPC or its members in the state-court case and, consequently, that State Auto owes no duty to defend or indemnify the CAPC, the City, or its members in that lawsuit.[1]

For purposes of this Order, the Court will place the separate Defendants in two groups according to their roles in the state-court action:

- "**State-Court Plaintiffs**" include:

    o Tracy Johnson, former events director of the CAPC;

    o Gina Rambo, former interim executive director of the CAPC;

    o James R. "Rick" Bright, former finance director and former interim director of the CAPC;

    o Greg Moon, former commissioner of the CAPC; and

    o Karen Pryor, former sales director of the CAPC.

- "**Eureka Defendants**" include:

    o The CAPC;

    o The City of Eureka Springs, Arkansas;

---

[1] Though State-Court Plaintiffs contend that there is coverage as to nearly all claims in the state suit, Eureka Defendants agree with State Auto that there is no coverage for any claims in the underlying lawsuit. (Doc. 64, ¶ 4; Doc. 65, pp. 1–2).

- o   Butch Berry, mayor of Eureka Springs;

- o   Kim Stryker, employee of Eureka Springs as Chief Administrative Assistant to Mayor Berry;

- o   Carol Wright, former commissioner and chair of the CAPC;

- o   Jeff Carter, former commissioner and chair of the CAPC;

- o   James DeVito, former commissioner of the CAPC and city councilman;

- o   Harry Meyer, former commissioner of the CAPC and city councilman;

- o   Melissa Green, former commissioner of the CAPC and city councilwoman;

- o   Lacy Eckberg, former executive director of the CAPC prior to Rambo;

- o   Patrick Burnett, former commissioner of the CAPC; and

- o   Lonnie Clark, finance director of the CAPC.

Collectively, the State-Court Plaintiffs filed twenty-three causes of action against the Eureka Defendants, including various tort, contract, and statutory claims. State-Court Plaintiffs' twenty-fourth cause of action is a direct action against State Auto and is made only "[t]o the extent [its] polic[y] cover[s] the actions and omissions of the [Eureka] Defendants." (Doc. 50-3, p. 35).

The operative complaint in the underlying suit is the State-Court Plaintiffs' Third Amended Complaint ("TAC"). Totaling almost 120 pages of mostly non-chronological, frequently redundant factual allegations, it is not a model of clarity. The Court attempts to make a timeline below of the main events that form the basis of the state case. While this does not capture every factual allegation, it provides an outline to organize the Court's

3

discussion of coverage.[2] Because the Court ultimately finds that there is no possibility of coverage under the facts as pled, it does not make findings as to disputed facts. Accordingly, wherever the Court discusses the facts of the underlying suit, it is describing the facts as alleged in the TAC.

- **Early 2020:**

  - Carol Wright allegedly made defamatory statements about State-Court Plaintiffs in an email to a private detective, John Brooks. These statements included alleging that Rick Bright was having an affair with Greg Moon and another city councilman. (Doc. 50-2, pp. 62–63; Doc. 50-4, p. 44). Wright released these communications to the local press in response to an Arkansas FOIA request around January 28, 2021. (Doc. 50-2, p. 63). The TAC claims that Wright's release of these communications was nonresponsive to the FOIA request. *Id.*

  - Lacey Ekberg sent Jeff Carter an email accusing State-Court Plaintiffs of routing CAPC business to outside businessowners, which the Court understands to mean giving local businessowners who were not affiliated with the CAPC improper access to CAPC computers and information. State-Court Plaintiffs claim that Carter made Ekberg send this email. Doc. 50-3, p. 27; *see also* Doc. 50-2, p. 76.

---

[2] The facts stated in the outline are taken directly from the TAC. Several of these facts are repeated in various iterations throughout the nearly 120 pages, and the Court does not aim to resolve internal inconsistencies that are immaterial to its analysis.

- **January 27, 2021:**

  - ○ Carter held two meetings with local citizens and businessowners at which he allegedly made defamatory statements against Tracy Johnson, Gina Rambo, and Bright. (Doc. 50-2, p. 27). He also told attendees that Moon would be removed from the CAPC. *Id.*

  - ○ Wright sent an email to the editor of a local newspaper that accused State-Court Plaintiffs of giving local businessmen improper access to CAPC files and allowing these outside influences to dictate the running of the CAPC. *Id.* at p. 73.

  - ○ Moon was removed from his position as CAPC commissioner by a vote of the other commissioners. State-Court Plaintiffs claim this vote could not actually remove Moon because the vote was either illegal and/or received insufficient votes. *Id.* at pp. 20–21.

  - ○ Following Moon's removal, the remaining commissioners voted to defund Johnson's position with the CAPC, which State-Court Plaintiffs allege was similarly inadequate. (Doc. 50-3, p. 22). Eureka Defendants represented to Johnson that she had been terminated. *Id.* at p. 24.

- **February 5, 2021:** Carter held another meeting with local citizens at which he, again, allegedly defamed State-Court Plaintiffs, including accusing Johnson of embezzlement. (Doc. 50-2, pp. 52, 75).

- **February 9, 2021:** Melissa Green told Rodney Slane, husband of Councilwoman Autumn Slane, that Rambo and Johnson were stealing money from the CAPC, along with other similar accusations against Bright and Pryor.

*Id.* at p. 59. This conversation was allegedly recorded by Mr. Slane and was later published in a local newspaper. *Id.*

- **February 17, 2021:** Kim Stryker repeated defamatory statements about Johnson and Rambo to Mr. Slane. These statements included that Johnson and Rambo were stealing money from the CAPC, which Stryker had heard from Carter telling Berry. *Id.* at pp. 52, 60.

- **February 22, 2021:**

  o In concert with Carter and Wright, Green allegedly filed a false police report, accusing State-Court Plaintiffs of "theft of business" by giving outside businessowners access to CAPC computers and information. A newspaper reported this on December 7, 2021. *Id.* at pp. 74, 76.

  o Berry and Lonnie Clark allegedly contacted the Arkansas Legislative Audit to falsely report that Johnson had stolen money from the CAPC. *Id.* at pp. 19, 50, 76. A local newspaper later published an article regarding this activity. *Id.* at pp. 50–51.

- **February 23, 2021:** Carter allegedly made defamatory remarks about Rambo in an email to the other commissioners, accusing her of ethics violations and unprofessional behavior. *Id.* at p. 58.

- **February 24, 2021:**

  o Rambo was terminated from her position with the CAPC. (Doc. 50-3, p. 24).

  o Per a vote by Carter, Wright, Green, James DeVito, Harry Meyer, and/or Patrick Burnett, the CAPC altered the meeting minutes from January 27,

2021. The alteration falsely showed that Moon's removal received sufficient votes. (Doc. 50-2, p. 30).

- **March 5, 2021:** Rambo was asked to go to the police station for questioning regarding Green's police report. *Id.* at p. 18.

- **April 5, 2021:** Berry made allegedly defamatory statements to Councilwoman Slane, including accusing Johnson of embezzlement. (Doc. 50-2, p. 50). This conversation also included a comment by Berry that he "did not know how employees can expect to sue their employers and not get fired," referring apparently to State-Court Plaintiffs' lawsuit. (Doc. 50-3, p. 10). Councilwoman Slane recorded this conversation, and it was later released to a local newspaper. (Doc. 50-2, p. 50).

- **April 14, 2021:** A local newspaper published allegedly defamatory statements made by Berry, Carter, and Green about Johnson. *Id.* at pp. 19, 51.

- **April 27, 2021:** An emergency hearing was held regarding the removal of Moon, at which Carter testified that Moon's removal had received sufficient votes, which State-Court Plaintiffs contend amounted to perjury. *Id.* at pp. 22, 43–44.

- **May 26, 2021:** According to the TAC, the state court issued an order finding Moon's removal to be illegal, *ultra vires*, and a nullity. *Id.* at p. 23. Moon tried to attend a meeting within his capacity as commissioner, providing the order to the other commissioners, but he was still barred from the meeting. *Id.*

- **August 6, 2021:** Moon resigned from the CAPC. *Id.* at p. 41.

- **Late 2021:** Eureka Defendants decided to move the CAPC's office and made the move without telling Bright or Pryor. (Doc. 50-3, p. 10). Pryor was told she would not be given a space in the new offices with the other CAPC employees. *Id.*

- **April 27, 2022:** Berry published an article in a local newspaper titled "Truth is Power," which allegedly repeated the embezzlement allegations against Johnson. (Doc. 50-2, pp. 51–52).

Throughout the TAC, State-Court Plaintiffs allege that the actions taken, particularly the defamation, were part of an overarching plan to remove State-Court Plaintiffs from their roles on the CAPC. *See, e.g.*, *id.* at p. 13 ("[I]n furtherance of their efforts to remove Moon and certain CAPC staff, Berry[,] Wright, Carter, [and] Green made false defamatory statements about Moon, Johnson, Bright, and Rambo . . . ."); *id.* at p. 27 ("[I]n furtherance of his preparations," Carter "made false slanderous allegations against Tracy Johnson, Gina Rambo, and Rick Bright . . . ."); *id.* at p. 35 ("As part of and in furtherance of their plan, Defendants Wright, Carter[,] Green and Berry agreed that their plan to remove Moon and take control of the CAPC would also include making defamatory allegations about Moon, Johnson, Rambo[,] and Bright that would create [ ] knowingly false, yet facially ostensible reasons to remove them from their positions with the CAPC.").

### B.  Relevant Policy Provisions

State Auto issued a Businessowners Policy to the CAPC, Policy Number 1000368247, with a coverage period of December 5, 2020, to December 5, 2021 ("the Policy"). (Doc. 50-1, p. 14). The Policy listed the CAPC as the named insured and the

City of Eureka Springs as an "other named insured." *Id.* The Policy outlines who is covered under the Policy as follows:

**C. Who Is An Insured**

**1.** If you are designated in the Declaration as:

. . .

> **d.** An organization other than a partnership, joint venture or limited liability, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. . . .

**2.** Each of the following is also an insured:

> **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company), or your managers (if you are a limited liability company) but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:
>
> > **(1)** "Bodily injury" or "personal and advertising injury":
> >
> > **(a)** To you . . . or to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;
>
> . . . .

(Doc. 50-1, p. 64). No party contests that the Eureka Defendants are insureds under the policy.

Coverage for Business Liability requires State Auto to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies," but that State Auto "will have no duty to defend the insured against any 'suit' seeking damages for

'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance does not apply." (Doc. 50-1, p. 54).   The parties do not seek coverage for bodily injury or property damage. *See* Doc. 57, p. 8 (State-Court Plaintiffs' concession); Doc. 65, p. 1 (Eureka Defendants' concession).  Thus, the only relevant coverage questions are (a) whether the State-Court Plaintiffs make claims for "personal and advertising injury," and (b) to the extent that they do, whether the insurance applies to those injuries.

### 1.   *"Personal and Advertising Injury" Definition*

Business Liability Coverage applies to "personal and advertising injury" "caused by an offense arising out of [the insured's] business." (Doc. 50-1, p. 54). For an injury to constitute a personal or advertising injury, it must arise out of one of the enumerated offenses in the Policy:

**F. Liability and Medical Expenses Definition**

. . .

**14.** "Personal and advertising injury" means injury, including consequential 'bodily injury', arising out of one or more of the following offenses:

> **a.** False arrest, detention or imprisonment;
>
> **b.** Malicious prosecution;
>
> **c.** [W]rongful eviction . . . ;
>
> **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> . . .
>
> **f.** The use of another's advertising idea in your "advertisement"; or
>
> **g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(Doc. 50-1, pp. 66, 68–69). Paragraph F.14.e of Section II (omitted above) defines "personal and advertising injury" to include "oral or written publication, in any manner, of material that violates a person's right of privacy." (Doc. 50-1, p. 68). However, this is explicitly excluded by an endorsement that amends the definition of "personal and advertising injury." (Doc. 50-1, p. 76).

### 2. *"Personal and Advertising Injury" Exclusions*

The Policy specifically carves out certain injuries from coverage for "personal and advertising injury." Relevant here, Paragraph B.1.p. of Section II of the Policy specifically excludes injuries arising out of knowing infliction of "personal and advertising injury," knowing defamation, or breach of contract:

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

. . .

**p. Personal And Advertising Injury**

"Personal and advertising injury":

> **(1)** Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";
>
> **(2)** Arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity;
>
> . . .
>
> **(5)** Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";
>
> . . . .

(Doc. 50-1, p. 56, 61).

A later endorsement adds an additional exclusion to Paragraph B.1.p and further excludes "personal and advertising injury" that arises out of "any access to or disclosure of any person's . . . confidential or personal information, including . . . financial information, credit card information, health information or any other type of nonpublic information." (Doc. 50-1, p. 101) ("Disclosure of Personal Information Exclusion").

### 3.    *Criminal Acts Exclusion*

Paragraph B.1 of Section II of the Policy also excludes:

**r. Criminal Acts**

"Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

(Doc. 50-1, p. 62).

### 4.    *Employment-Related Practices Exclusion*

Lastly, the Policy includes an endorsement that adds an exclusion to Paragraph B.1 of Section II to exclude employment-related practices:

This insurance does not apply to "bodily injury" or "personal and advertising injury" to:

**(1)** A person arising out of any:

**(a)** Refusal to employ that person;

**(b)** Termination of that person's employment; or

**(c)** Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person[.]

. . . .

This Exclusion applies:

**(1)** Whether the injury-causing event described in Paragraph (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

**(2)** Whether the insured may be liable as an employer or in any other capacity; and

**(3)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

(Doc. 50-1, p. 99).

### C.  Procedural History

State-Court Plaintiffs first filed their state-court suit in 2021. Over the next two years, they filed various iterations of the complaint. The final, operative TAC was filed on May 30, 2023.

On May 17, 2023, State Auto filed its request for a declaratory judgment in this Court seeking declarations that it had no duty to defend or indemnify Eureka Defendants in the underlying state action. State-Court Plaintiffs asked this Court to abstain from ruling on the declaratory judgment or stay the case pending resolution in the state case, which this Court denied in a Memorandum Opinion and Order dated February 20, 2024. *See* Doc. 43. The parties then engaged in discovery, and State Auto moved for summary judgment on August 5, 2024, which became ripe on September 9, 2024.

## II.  LEGAL STANDARD

### A.    Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must view the facts in

the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Com. of El Dorado v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 248).

## B.    Determining Coverage

In Arkansas, "[t]he duty to defend and the duty to indemnify 'are distinct, independent obligations.'" *Safeco Ins. Co. of Am. v. Dooms*, 617 F. Supp. 3d 980, 989 (W.D. Ark. 2022) (quoting *S. Farm Bureau Cas. Ins. Co. v. Watkins*, 2011 Ark. App. 388, at *7 (2011)). "As a general rule . . . the pleadings against the insured determine the insurer's duty to defend." *Kolbek v. Truck Ins. Exch.*, 2014 Ark. 108, at *6 (2014) (citing

*Murphy Oil USA, Inc. v. Unigard Sec. Ins. Co.*, 347 Ark. 167, 175 (2001) (collecting cases)). "Because the duty to defend is based only on the allegations in the underlying pleadings, it 'is broader than the duty to indemnify.'" *Dooms*, 617 F. Supp. 3d at 989–90 (quoting *Kolbek*, 2014 Ark. 180, at *6). "To trigger a duty to defend . . . the complaint must allege facts that would come within the coverage of the policy." *Scottsdale Ins. Co. v. Morrowland Valley Co., LLC*, 2012 Ark. 247, at *9 (2012) (citing *Murphy Oil*, 347 Ark. at 176). "[W]hen there is a possibility that the injury or damage [may] fall within the policy coverage," the duty to defend arises. *Kolbek*, 2014 Ark. 180, at *6 (citing *Murphy Oil*, 347 Ark. at 176). But "[w]here there is no possibility that the damage alleged in the complaint may fall within the policy coverage, there is no duty to defend." *Id.*

Insurers have a duty to indemnify "if the proved facts show an event occurred for which coverage applies." *Dooms*, 617 F. Supp. 3d at 990. The duty to indemnify turns not on the pleadings but on "the actual facts and circumstances giving rise to liability in the underlying suit." 43 Am. Jur. 2d Insurance § 676 (2022) (collecting cases). However, "[c]ourts are permitted to rule on an insurer's duty to indemnify before the insured's liability has been established in the underlying lawsuit." *Dooms*, 617 F. Supp. 3d at 990 (citing *Kolbek*, 2014 Ark. 180, at *9–10). Given that the duty to defend is broader than the duty to indemnify, "if there is no duty to defend, there is no duty to indemnify." *Auto-Owners Ins. Co. v. Hambuchen Constr., Inc.*, 2016 WL 7634791, at *2 (E.D. Ark. Nov. 18, 2016); *see also Landers Auto Grp. No. One, Inc. v. Cont'l W. Ins. Co.*, 621 F.3d 810, 815 (8th Cir. 2010) ("If Continental does not have a duty to defend Landers on these claims, it certainly cannot have a duty to indemnify based on any of the same claims. There is simply no coverage under the policy for the Clark complaint in its present form.").

## III. THRESHOLD POLICY INTERPRETATION ISSUES

The Court will first address the parties' arguments regarding the interpretation of certain exclusions. Then, the Court will go through the causes of action in the State TAC and analyze whether there is a possibility of coverage triggering a duty to defend and, if so, whether there is a material issue of fact as to whether State Auto might be required to indemnify Eureka Defendants.

In Arkansas, "[w]hen reviewing insurance policies," courts must "adhere to the longstanding rule that, where the terms of the policy are clear and unambiguous, the policy language controls." *Smith v. Shelter Mut. Ins. Co.*, 327 Ark. 208, 210 (1997) (citations omitted). A court need not look to rules of construction unless an ambiguity exists. *Id.* (citations omitted). And "[t]he terms of an insurance contract are not to be rewritten under the rule of strict construction against the company issuing it so as to bind the insurer to a risk which is plainly excluded and for which it was not paid." *Id.* (citations omitted). "Contracts of insurance should receive a practical, reasonable, and fair interpretation consonant with the apparent object and intent of the parties in light of their general object and purpose." *Parker v. S. Farm Bureau Cas. Ins. Co.*, 104 Ark. App. 301, 305 (2009).

"On the other hand, if the language is ambiguous," the court "will construe the policy liberally in favor of the insured and strictly against the insurer." *Elam v. First Unum Life Ins. Co.*, 346 Ark. 291, 297 (2001) (citations omitted). "Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one reasonable interpretation." *Id.* (citations omitted). "[W]here the issue of ambiguity may be resolved by reviewing the language of the contract itself"—that is, without looking to

extrinsic evidence—"it is the trial court's duty to make such a determination as a matter of law." *Id.* None of the interpretation issues here require looking to extrinsic evidence or deciding disputed facts, thus the Court is able to resolve any such issues as a matter of law.

## A. Plaintiff's Ambiguity Arguments

### 1. Endorsements and Exclusions Do Not Render the Policy Ambiguous

State-Court Plaintiffs argue that the Policy is ambiguous as a matter of law because its endorsements an exclusions conflict with other provisions of the Policy, and the Policy should, thus, be construed against State Auto. "Generally, exclusions in a policy or its endorsements are as much a part of the contract as other parts and must be given the same consideration in determining what coverage exists," *George v. Great Lakes Reinsurance (UK) PLC*, 2015 Ark. App. 36, at *5 (2015) (citing *Schultz v. Farm Bureau Mut. Ins. Co.*, 328 Ark. 64 (1997)), and "absent statutory strictures to the contrary, exclusionary clauses are generally enforced according to their terms," *Smith*, 327 Ark. at 210 (citations omitted). State-Court Plaintiffs' contention "stumbles over the well-established rule of insurance law that where provisions in the body of the policy conflict with an endorsement or a rider, the provision of the endorsement governs." *George*, 2015 Ark. App. at *6. (citing *Union Elec. Co. v. AEGIS Energy Syndicate 1225*, 713 F.3d 366, 368 (8th Cir. 2013); *Hendricks v. Curators of Univ. of Mo.*, 308 S.W.3d 740, 746 (Mo. Ct. App. 2010); 2 Couch on Insurance 3d §§ 21:21, 21:22 (1996)).

While State-Court Plaintiffs may have a point that insurance contracts would benefit from more straightforward drafting and language, the Policy at issue here is not at all atypical of insurance contracts. The exclusion for knowing defamation is included in

the Coverage Form in the clearly labelled "Exclusions" section located within several pages of the definition for "personal and advertising injury." (Doc. 50-1, p. 61). The endorsement amending the definition of "personal and advertising injury" to exclude privacy injuries is appended to the Policy and clearly marked "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." *Id.* at p. 76; *see George*, 2015 Ark. App. at *5. The Employment-Related Practices ("ERP") Exclusion endorsement contains an identical warning. *See id.* at p. 99. The mere presence of these exclusions and endorsements that may conflict with the definitional section for "personal and advertising injury" does not render the Policy ambiguous. *See George*, 2015 Ark. App. at *5.

As the court in *Talen v. Employers Mutual Casualty Co.* aptly noted:

The fact the policy's general definition of the term "personal injury" encompasses defamation does not set up a fatal inconsistency or ambiguity because in another section of the policy the employment-related-practices exclusion coverage is excluded for certain personal injuries, including defamation, in a particular context. An insurance policy may exclude coverage for particular injuries or damages in certain specified circumstances while providing coverage in other circumstances.

703 N.W.2d 395, 403 (Iowa 2005) (brackets omitted) (quoting *Frank & Freedus v. Allstate Ins. Co.*, 52 Cal. Rptr. 2d 678, 684 (1996)).

### 2. The Phrase "Directed At" in the Employment-Related Practices Exclusion Is Not Ambiguous

State-Court Plaintiffs also contend that the ERP Exclusion is ambiguous due to its use of the phrase "directed at" in excluding injuries arising out of

Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution *directed at* that person[.]

(Doc. 50-1, p. 99 (emphasis added)). State-Court Plaintiffs argue that the Exclusion is "more likely meant to cover those situations in which constructive, good faith communications are 'directed at' or communicated to the person about whom they are spoken or written in an employment related context . . . , but, for reasons unintended or incidental to the communication come into possession of a third party." (Doc. 57, p. 18).

This argument is a nonstarter. Cambridge Dictionary defines the phrase "direct something at someone/something" to mean "to aim something in a particular direction or at a particular person." Direct Something at Someone/Something, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/direct-at [https://perma.cc/TWT2-RPPY]. In the case of defamation, it is not required that a defamatory statement be made to a person for it to be aimed at them. To the contrary, defamatory statements, by their nature, require publication to a third party. The plain meaning of the phrase "directed at" as used in this exclusion is synonymous with "targeting," and in the defamation context, a defamatory statement may target someone without being made *to* them.

Moreover, defamation is commonly described as being "directed at" a person when it is *about* them, even if the statement is not made *to* that person. And other courts, including the Eighth Circuit, have described defamation in this way in other contexts without noting any ambiguity or confusion. *See, e.g.*, *Brummett v. Taylor*, 569 F.3d 890, 892 (8th Cir. 2009) (citations omitted) (describing defamation as being "directed at" a person when it is "of and concerning" that person); *Tholen v. Assist Am., Inc.*, 528 F. Supp. 3d 1017, 1024 (D. Minn. 2021) ("A plaintiff does not have to be specifically named in the defamatory statement so long as a reader by fair implication would understand the

statement to be directed at the plaintiff. Whether an allegedly defamatory statement *concerns* that plaintiff is generally a question of fact for the jury." (emphasis added) (cleaned up)); *see also Vitti v. Vockrodt*, 2016 WL 4487884, at *4 (W.D. Mo. Aug. 24, 2016) (similar).

The Court does not believe that "directed at" as used in the ERP Exclusion is ambiguous, and it will not adopt State-Court Plaintiffs' strained interpretation. *See* 2 Couch on Insurance 3d § 21:18 (2024) ("[T]he rule of ambiguity does not require that the court search for an ambiguity when the meaning of the policy is clear. In fact, courts are not authorized to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity." (footnotes omitted)).

### B.  Scope of the Employment-Related Practices Exclusion

As recited above, this exclusion bars coverage of employment-related practices. And while the ERP Exclusion provides examples of "employment-related practices," including defamation, discrimination, and humiliation, the Policy provides no additional information as to when a practice, like defamation, is "employment related." State-Court Plaintiffs bring multiple counts of defamation, so the relevant question here is when is a practice like defamation "employment-related?"

Because the Arkansas Supreme Court has not spoken on this issue, or ERP exclusions more broadly, the Court "may consider relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." *Bass v. Gen. Motors Corp.*, 150 F.3d 842, 847 (8th Cir. 1998) (citations omitted).

### 1. Does A State-Court Plaintiff Have to Be An Employee for Their Injuries to Be "Employment-Related"?

First, the Court considers whether "employment-related practices" must necessarily involve an employee, as opposed to claims between two appointed officials. There appears to be no dispute between the parties that Rambo, Bright, and Pryor were all employees of the CAPC and/or Eureka Springs, that Johnson was either an employee or independent contractor, and that Moon was an appointed commissioner on the CAPC. No party, however, raises the issue of Johnson being an independent contractor or Moon being an appointed official as potentially precluding their claims from falling within the ERP Exclusion. Still, the Court feels it necessary to address this point.

Looking to the language of the Policy, the Court concludes that, under the facts of this case, the Exclusion unambiguously applies to employees as well as independent contractors and appointed officials. Starting with the plain language of the term "employment-related," the Court turns to dictionary definitions. In deciding a similar case, the First Circuit cited the following definitions:

> "Employment" is defined as "the state of being employed; employ; service." *The Random House Dictionary of the English Language* 638 (2d ed. 1987). The definition of "employ" is "to hire or engage the services . . . provide employment for; have or keep in one's service." *Id*. "Employment" encompasses a number of arrangements between two parties in which one party performs services or duties for another. *See, e.g.*, *American Heritage Dictionary* 586 (4th ed. 2000) (defining "employ" to mean "to engage the services of; put to work," and "employment" to mean "the act of employing," "the state of being employed," and "[t]he work in which one is engaged; occupation"); *Webster's II New Riverside University Dictionary* 429 (1994) (same); *The American Heritage Dictionary* 450 (2d col. Ed.1985) (same).

*Ruksznis v. Argonaut Ins. Co.*, 774 F.3d 784, 788 (1st Cir. 2014). In reliance on these definitions, the First Circuit concluded that an appointed plumbing inspector of a town who operated as an independent contractor, even though not an employee, "was

employed by the Town and performed his duties as a municipal official for the Town as part of the employment." *Id.* at 789. The Court finds that the plain language of the Exclusion does not preclude its applicability to Johnson's or Moon's claims.

The Policy's language taken in context supports this reading. To start, the ERP Exclusion states that it bars coverage for bodily or personal and advertising injuries to a "person" that arise out of specific employment-related practices; it does not specify that the injured person be an "employee" of the insured. Doc. 50-1, p. 99; *see Hartford Ins. Co. of the Midwest v. Price Postel & Parma LLP*, 2012 WL 13012654, at *7–9 (C.D. Cal. Nov. 21, 2012) (applying a materially similar ERP exclusion to bar coverage for injuries to a partner of a firm, in part, because "[t]here is no express language that limits application of the exclusion to situations in which the injured party is an employee of the insured"); *George S. May Intern. Co. v. Arrowpoint Capital Corp.*, 2012 WL 3264397, at *7 (La. App. Aug. 10, 2012) (interpreting a materially similar exception and determining that the language of the exclusion "does not limit its applicability to those individuals who have an employment relationship with the insured."). The Exclusion's reference to injuries to a "person" contrasts the language in the Policy's "Employer's Liability" Exclusion that bars coverage for bodily injury to "[a]n 'employee' of the insured arising out of and in the course of: [ ] Employment by the insured; or [ ] Performing duties related to the conduct of the insured's business." (Doc. 50-1, p. 57).

Lastly, it skirts reason to assume that the parties intended to enter into an insurance contract that barred coverage for defamation committed by a commissioner against, for example, the interim executive director, but not against another commissioner simply because one was hired and one was appointed. As in *Ruksznis*, Moon is a

municipal official who performed his duties as an appointed commissioner as part of his employment with Eureka Springs and the CAPC, and Johnson is an employee or independent contractor who did the same. Without any argument on this issue from the parties, the Court has followed what it believes the Arkansas Supreme Court would do, guided by persuasive authority on this issue, and finds that the ERP Exclusion sweeps in employment-related injuries even to those who are not employees in the technical sense.

### 2.    When Does An Injury "Arise Out Of" an "Employment-Related Practice"?

In *Cooper v. Westfield Insurance Co.*, 488 F. Supp. 3d 430 (S.D.W. Va. 2020), the district court for the Southern District of West Virginia noted that federal courts are divided "as to whether the language of the ERP exclusions should be narrowly or broadly defined." *Id.* at 440. The court explained, "[t]he division focuses on the breadth of the phrase 'arising out of any . . . employment-related practices, policies, acts or omissions.'" *Id.* (citations omitted).

Though the Arkansas Supreme Court has interpreted the phrase "arising out of" broadly, these decisions are limited to interpretations of certain coverage-granting provisions, rather than exclusions. *See, e.g.*, *Hisaw v. State Farm Mut. Auto. Ins. Co.*, 353 Ark. 668, 678–81 (2003). Notwithstanding this distinction, a broad interpretation of this phrase is in keeping with other jurisdictions' interpretation of this phrase within the context of ERP exclusions. *See, e.g.*, *Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) (applying Missouri's broad interpretation of "arising out of" to a materially identical ERP exclusion); *Peterborough Oil Co., Inc. v. Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 241 (D. Mass. 2005) (applying Massachusetts's similarly broad interpretation). The key difference in whether courts construe the exclusion narrowly or

broadly depends on whether they focus on the phrase "arising out of" or "employment related." In other words, while some courts interpret the phrase "arising out of" as "requiring a broad construction of the ERP exclusion to bar coverage for any claim arising out of the employment relationship," others interpret "employment related" to limit the exclusion to "matters that directly concern the employment relationship itself, such as . . . tortious acts that may accompany [ ] personnel decisions." *Cooper*, 488 F. Supp. 3d at 440 (comparing the breadth of *Capitol Indemnity* with the narrowness of *Peterborough Oil*).

"Under Arkansas law, insurance policy provisions should be interpreted in favor of the insured, and exclusions are to be strictly construed against the insurer with all reasonable doubts in favor of the insured." *Bruce Oakley, Inc. v. Farmland Mut. Ins. Co.*, 245 F.3d 1027, 1029 (8th Cir. 2001) (citations omitted). Though both the broad and narrow interpretations are reasonable, the Court believes the narrower interpretation is more favorable to the insured. The Court further believes it would be inappropriate to adopt the broad interpretation of the ERP Exclusion for two reasons. First, in its broad interpretation of "arising out of" in *Hisaw*, the Arkansas Supreme Court was interpreting a coverage-granting provision in which a broad construction was more favorable to the insured; it is not clear whether the Arkansas Supreme Court would take a similarly broad approach in interpreting an exclusion that barred coverage. And second, mapping the construction of the term "arising out of" onto the construction of the provision as a whole overlooks two distinct relationships at play here: (a) the causal relationship between the injury and the tortious conduct, delineated by the phrase "arising out of," and (b) the relationship between the tortious conduct and the employment, delineated by the phrase "employment

related." Accordingly, the Court will adopt the narrower construction, looking to *Peterborough Oil* and other jurisdictions that provide a more nuanced framework for analyzing the ERP Exclusion.

The term "employment related" "is not technical in nature," but is "used in its ordinary sense, i.e., related to employment," and "it modifies the specified acts (including defamation)." *Frank & Freedus*, 52 Cal. Rptr. 2d. at 684.[3] State-Court Plaintiffs propose that, for an act to be employment related, it must occur within the context of employment. (Doc. 57, p. 25). State-Court Plaintiffs then argue that the alleged defamation in this case occurred outside the employment context because the statements were made at breweries, on phone calls, and in letters—i.e., outside the "work setting." *See* Doc. 57, p. 29. State-Court Plaintiffs cite no case law for this interpretation of what constitutes an employment context.

Instead, the Court has gleaned several factors from other jurisdictions that may be weighed in considering whether tortious conduct, like defamation, occurred within the employment context: whether there is a nexus between the tortious statements and the employment; whether the statement concerned the person's work performance; the temporal proximity between the defamation and the term of employment; whether the underlying tortfeasor and plaintiff have a relationship outside the employment relationship; and whether the defamation accompanied a personnel decision. *See Low v. Golden Eagle Ins. Co.*, 128 Cal. Rptr. 2d 423, 428–29 (1st Dist. 2002) (nexus and outside relationship) (synthesizing *Loyola Marymount Univ. v. Hartford Accident & Indem. Co.*,

---

[3] The only case law from the Arkansas Supreme Court that this Court was able to locate mentioning "employment-related" involved statutory interpretation regarding retirement plans. This did not prove at all helpful to construing the term in this context.

271 Cal. Rptr. 528 (2d Dist. 1990); *Frank & Freedus*, 52 Cal. Rptr. 2d 678, *HS Servs., Inc. v. Nationwide Mut. Ins. Co.*, 109 F.3d 642 (9th Cir. 1997); and *Golden Eagle Ins. Corp. v. Rocky Cola Cafe, Inc.*, 114 Cal. Rptr. 2d 16 (2d Dist. 2001), several of which considered whether the statement was made about work performance); *Peterborough Oil*, 397 F. Supp. 2d at 238 (personnel decision); *Talen v. Emps. Mut. Cas. Co.*, 703 N.W.2d 395, 403–04 (Iowa 2005) (work performance).

Under the narrower interpretation—and certainly under *Capitol Indemnity*'s broader construction if applied—State-Court Plaintiffs miss the mark on the meaning of "employment related." In order to give structure to the Court's analysis and adopt a framework more favorable to the insured, the Court will use the identified factors to describe the connection between the tortious conduct and the employment and, thereby, assess the sufficiency of the relationship.

### IV. COVERAGE[4]

Courts may evaluate coverage using the following steps: (1) "examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage"; (2) if coverage is triggered under the policy, "examine the various exclusions to see whether any of them preclude coverage of the present claim"; and (3)

---

[4] Nearly all—if not all—of the defamation causes of action are pled as "intentional" defamation. However, State-Court Plaintiffs make some alternative arguments in the TAC that if defamation was not intentional and knowing, it was reckless or even negligent. State Auto asks this Court to assess coverage under certain exclusions that bar coverage for defamation that is knowingly false. Although the Eureka Defendants agree with State Auto that there is no coverage as to any claims, they object to this Court making any findings as to the Eureka Defendants' *mens rea*. Unique to this case is that the intentionality of the conduct will likely affect the immunity analysis under Arkansas Code § 21-9-301(a) in the state court. Therefore, this Court will avoid making such a determination as it decides coverage.

if an exclusion applies, "look to see whether any exception to that exclusion reinstates coverage." *Hambuchen Constr., Inc.*, 2016 WL 7634791, at *3 (quoting *Columbia Ins. Grp., Inc. v. Cenark Project Mgmt. Servs., Inc.*, 2016 Ark. 185, at *6 (2016)). If, however, under the first step, "it is clear that the policy was not intended to cover the claim asserted, the analysis ends there." *Id.* (quoting *Cenark Project Mgmt. Servs.*, 2016 Ark. 185, at *6).[5]

### A. Duty to Defend

#### 1. *Cause of Action No. 1: No Coverage Because No Personal or Advertising Injury Pled and/or Because the ERP Exclusion Applies and/or Because the Criminal Acts Exclusion Applies*

Cause of Action No. 1 is a claim brought by Moon against certain Eureka Defendants that asserts they intentionally interfered with Moon's contract/prospective business dealings and interfered with the performance of his duties as a public official.[6] This Cause of Action covers a broad range of factual allegations, only one of which—defamation—falls within the Policy's definition of an offense that may cause "personal and advertising injury." This Cause of Action alleges that Wright published false stories about Moon, including that Moon threatened to kill Wright. (Doc. 50-2, p. 26). According to the TAC, these statements were made as part of Wright's "campaign to remove Moon from the CAPC." *Id.*

---

[5] For the sake of brevity, where step two is clearly determinative, the Court may assume *arguendo* that coverage was triggered under step one.

[6] Cause of Action No. 1: "A Claim for the Tort of Intentional Interference with Contract/Prospective Business Dealings and for Interference with a Public Official's Performance of Duties, A Claim by Greg Moon Against Berry, Wright, Carter, Green, Meyer, DeVito, and Burnett individually and in Their Official Capacities as Mayor and CAPC Commissioners" (Doc. 50-2, p. 26).

Compared to the other Causes of Action in the TAC, there is limited information about the statements Wright made here, making it more difficult to determine whether there is a "nexus" between the statements and Moon's position with the CAPC. The TAC frames these statements as advancing Wright's goal of removing Moon, and there is no allegation of an outside relationship that would provide an alternative motive for these statements.[7] In fact, the Cause of Action states that Eureka Defendants' "plan to remove Moon and take control of the CAPC would also include making defamatory allegations about Moon . . . that would create a knowingly false, yet facially ostensible reason[ ] to remove [him] from [his] position[ ] with the CAPC." (Doc. 50-2, p. 35). This places the relationship between the statements and Moon's employment with the CAPC well within the range required to establish these statements as employment related. Thus, to the extent the claim for interference with business dealing relies on the alleged defamatory statements, coverage for any resulting injuries would be barred under the ERP Exclusion.

To the extent any personal or advertising injury is alleged regarding interference with a public official's duties, coverage for such an injury would be barred under the Criminal Acts Exclusion. *See infra* Section IV.A.2 (discussing Cause of Action No. 3). Because this claim is predicated on acts that either do not allege "personal and advertising injury" or that fall under the ERP Exclusion or Criminal Acts Exclusion, there is no possibility of coverage.

---

[7] The Court's understanding is that some parties may have had some degree of outside relationship—as many of them were owners of local businesses that presumably competed for business, advertising opportunities, or funding. However, the allegations in the TAC focus on the defamatory statements as intending to justify the removal from the CAPC. So, while there may have been some degree of outside relationship, there is no allegation, indication, or argument that it was the basis of the defamation.

### 2.    *Causes of Action Nos. 2 and 3: No Coverage Under the Criminal Acts Exclusion*

Causes of Action Nos. 2 and 3 allege that Eureka Defendants Wright, Carter, Meyer, Burnett, Green, and DeVito violated certain Arkansas criminal statutes, evidencing their negligence towards State-Court Plaintiffs.[8] More specifically, Cause of Action No. 2 alleges that Eureka Defendants violated Arkansas Code §§ 5-53-102 and 5-54-121, state felonies, by tampering with public records and committing perjury regarding the CAPC's removal of Moon. (Doc. 50-2, p. 42). Cause of Action No. 3 claims that Eureka Defendants violated Arkansas Code § 5-54-102 by interfering with Moon's—i.e., a public official's—duties, which is a misdemeanor under Arkansas law. (Doc. 50-2, p. 46). Because the Policy explicitly excludes personal and advertising injuries that arise out of criminal acts committed by or at the direction of the insured, Causes of Action Nos. 2 and 3—which are entirely predicated on the violation of criminal statutes—are barred from coverage.

### 3.    *Cause of Action No. 4: No Coverage Under the ERP Exclusion*

Cause of Action No. 4 alleges that certain Eureka Defendants slandered and libeled Bright and Moon.[9] Specifically for this Cause of Action, the TAC alleges that

---

[8] Cause of Action No. 2: "Violation of Statute as Evidence of Negligence or Other Fault; Violation of A.C.A. §§ 5-54-121 and 5-53-102[;] The Felony of Tampering with a Public Record and The Felony of Perjury, Claims of Greg Moon, Rick Bright, Gina Rambo and Tracy Johnson and All other Plaintiffs, Individually and as Taxpayers Against Wright, Carter, Meyer, Burnett, Greene and DeVito" (Doc. 50-2, p. 42).

Cause of Action No. 3: "Violation of Statute, A.C.A. § 5-54-102[;] Interference with Public Officials' Performance of Duties, a Claim for Negligence by Plaintiff Greg Moon, Tracy Johnson, Gina Rambo, Rick Bright and Karen Pryor Against Defendants Wright, Carter, DeVito, Greene, Meyer and Burnett in Their Individual and Official Capacities" (Doc. 50-2, p. 46).

[9] Cause of Action No. 4: "The Intentional Tort of Slander and Libel[;] A Claim by Greg Moon and Rick Bright Against Wright, Carter, Berry, Greene, DeVito and Meyer Individually and/or in Their Official Capacities" (Doc. 50-2, p. 47).

Eureka Defendants made statements that Moon was "unable, ineligible, or unqualified" to serve on the CAPC before illegally removing him and fraudulently reporting that they had sufficient votes and authority to do so. (Doc. 50-2, p. 48). Apparently, Eureka Defendants then represented that Bright, acting as secretary, had failed to accurately capture the vote to remove Moon. *Id.* After Moon was removed, Bright was removed from his role as acting secretary. *Id.*

The statements about Moon concerned whether he was fit to serve on the CAPC, and the statements about Bright were that he performed his job poorly by inaccurately capturing the January 27 vote on Moon's removal. Both of these have a "nexus" between the statements made and Moon's and Bright's employment with the CAPC. *See Low*, 128 Cal. Rptr. 2d at 428. There is no allegation or argument from State-Court Plaintiffs that the defamatory statements were motivated or related to any outside relationship. *Id.* Lastly, the statements were allegedly made "in furtherance of [Eureka Defendants'] efforts to remove Moon and certain CAPC staff," (Doc. 50-2, p. 13), "in order to create a knowingly false, yet facially ostensible reason to remove them from their positions with the CAPC." (Doc. 50-2, p. 24). Thus, the statements accompanied a personnel decision. *See Peterborough*, 397 F. Supp. 2d at 238. Again, because this is sufficient for the alleged harm to fall within the ERP Exclusion, there is no possibility of coverage.

### 4.    *Cause of Action No. 5: No Coverage Under the ERP Exclusion*

The TAC alleges in Cause of Action No. 5 that Carter and Berry defamed Johnson.[10] Per the TAC, Stryker asserted that Carter told Berry that Johnson had

---

[10] Cause of Action No. 5: "The Intentional Tort of Defamation, Slander and Libel[;] A Claim by Tracy Johnson Against Butch Berry, and Jeff Carter, Individually and in Their Official Capacities" (Doc. 50-2, p. 49).

embezzled CAPC funds. (Doc. 50-2, p. 52). Berry then allegedly communicated this to Councilwoman Slane, who recorded the conversation. *Id.* at p. 50. This recorded conversation was then published to a newspaper in Eureka Springs. *Id.* at p. 51. Apparently, Berry then published an article on April 27, 2022, titled "Truth is Power," where he repeated these allegations. *Id.* at pp. 51–52. This Cause of Action further alleges that Berry and/or Clark told the Arkansas Legislative Audit that Johnson was stealing from the City and/or the CAPC. *Id.* at p. 50.

Assuming this claim falls within the Policy's grant of coverage, the defamatory statements would be excluded from coverage under the ERP Exclusion. To start, the statements were allegedly made "in furtherance of [Eureka Defendants'] efforts to remove . . . certain CAPC staff," like Johnson. *Id.* at p. 13. That is, according to the TAC, Eureka Defendants were justifying the termination of Johnson. *See id.* at p. 24; *Peterborough*, 397 F. Supp. 2d at 238. Further, the content of the statements related to her job performance and the relationship with her employer, creating a nexus between the statement and her employment. *See, e.g.*, *Low*, 128 Cal. Rptr. 2d at 428. Lastly, there is no allegation or argument of any outside relationship between Johnson and Carter or Berry that could provide an alternative explanation or purpose as to why a defamatory statement was made. *See, e.g.*, *id.*[11]

---

[11] Though the TAC does allege that Berry wrote the "Truth is Power" article to restore his reputation after being accused of lying about the embezzlement allegations, this does not break the causal chain between the alleged defamation and Johnson's employment; the comment still revolved around Johnson's conduct as an employee of the city and was made by the Mayor of the city, during an ongoing attempt to legitimize the personnel decision to terminate Johnson and other personnel decisions regarding other State-Court Plaintiffs.

Because the alleged statements occurred within the employment context, the Court finds there is no possibility of coverage as to the allegations in this Cause of Action.

### 5.    Cause of Action No. 6: No Coverage Under the ERP Exclusion and/or Because It Is a Privacy Claim

Cause of Action No. 6 alleges that Eureka Defendants defamed Johnson, Rambo, Bright, and Pryor, primarily through statements made by Carter in meetings he held with Eureka Springs citizens on January 27 and February 5, 2021.[12] The Court will summarize the alleged statements made against each State-Court Plaintiff.

According to the TAC, Carter stated that Rambo used her position as Interim Executive Director to route business directly to certain local businesses to the exclusion of others, in violation of state law. (Doc. 50-2, p. 53). The TAC further alleges that Carter accused Rambo of creating a new budget line within the CAPC for her own use. *Id.* at p. 55. Carter allegedly made other statements about how Rambo performed her role unethically and lacked the ability to do the job. *Id.* at p. 57. Beyond his statements at these meetings, Carter allegedly emailed the other commissioners regarding ethical and professional violations by Rambo, *id.* at p. 58, and told Berry that Rambo was stealing money, *id.* Stryker then told Mr. Slane that Carter had told Berry that Rambo embezzled funds with Johnson—a conversation that was allegedly recorded and published in the newspaper. *Id.* at p. 60.

Allegedly, Carter made several remarks that Johnson was acting improperly within her role as events coordinator for the CAPC, was difficult to work with, and should not

---

[12] Cause of Action No. 6: "The Intentional Torts of Defamation, Slander, Libel and False Light[;] A Claim of Tracy Johnson, Gina Rambo, Rick Bright and Karen Pryor Against Jeff Carter, Butch Berry, Melissa Green, and Kim Stryker Individually and in Their Official Capacities" (Doc. 50-2, p. 53).

have been hired. *Id.* at pp. 55–57. He also allegedly accused her of deleting records and receipts to cover up her improper actions, *id.* at p. 57, and told Berry that she was stealing, *id.* at p. 58, among other similar statements. Additionally, Green allegedly accused Johnson of embezzling funds from the CAPC, receiving kickbacks, and double dipping in CAPC funds. *Id.* at p. 59. Then, on April 5, 2021, Berry allegedly accused Johnson of embezzlement when speaking with Councilwoman Slane. *Id.* at p. 61.

Carter allegedly accused Bright of "inundat[ing] [C]arter with paperwork or information in response to Carter's request for information," which the TAC claims damaged Bright's reputation. *Id.* at pp. 55, 56. Additionally, the TAC alleges that Carter accused Rambo, Johnson, and Bright of unethically giving preferential treatment to a former CAPC commissioner. *Id.* at p. 56. And Carter allegedly stated that if an audit were performed on the CAPC it would "burn them at the stake," apparently implying improper conduct by Rambo, Johnson, Bright, and Pryor, *id.* at p. 55, and accusing them of being responsible for missing funds in the CAPC accounts, *id.* at p. 59.

The Court concludes that any defamation alleged here falls within the ERP Exclusion and, thus, is barred from coverage. In addition to the general allegations that the defamation in this case was made "in furtherance" of Eureka Defendants' plan to remove State-Court Plaintiffs from their positions with the CAPC, *id.* at p. 13, Cause of Action No. 6 specifically states that Eureka Defendants were attempting to "clear the way . . . to first remove Greg Moon from the CAPC and afterwards get rid of Rambo, Johnson, and Bright," *id.* at p. 56, and that the statements were "made to justify the actions that [Eureka Defendants] would take against [State-Court Plaintiffs] in the very near future," *id.* at p. 54. This, again, demonstrates how the TAC frames the statements as justification

33

for the personnel decision of removing the State-Court Plaintiffs.[13] *See Peterborough*, 397 F. Supp. 2d at 238. There is no evidence of outside relationships between the parties that would otherwise motivate the statements, leaving the alleged purpose of their statements—i.e., "clear[ing] the way . . . to get rid of" State-Court Plaintiffs—as the primary context for the alleged tortious conduct. *See Low*, 128 Cal. Rptr. 2d at 428. Lastly, the statements all regard some aspect of the State-Court Plaintiffs' performance of their jobs within the CAPC, creating a nexus between the statements and employment. *See id.* As with the previous causes of action for defamation, the relationship between the defamatory statements here and the employment falls well within the ERP Exclusion.

This Cause of Action, like many in the TAC, alleges that the Eureka Defendants placed the State-Court Plaintiffs in a false light. False light is an invasion of privacy claim, *see, e.g.*, *Dodrill v. Ark. Democrat Co.*, 265 Ark. 628, 637–38 (1979) (adopting false light as an invasion of privacy claim separate from defamation), and thus does not fall within the scope of "personal and advertising injury" under the Policy. *See* Doc. 50-1, pp. 68, 76.

For these reasons, there is no possibility of coverage for Cause of Action No. 4.

### 6.    *Cause of Action No. 7: No Coverage Under the ERP Exclusion and/or Because It Is a Privacy Claim*

Cause of Action No. 7 alleges that Wright defamed, libeled, and/or slandered Bright and placed him in a false light through her communications with Detective John Brooks

---

[13] Though many of the statements in this Cause of Action and throughout the TAC were made to people outside the CAPC and Eureka Springs employment, this does not take the statements outside the employment context where, as here, the employment context is working for the City.

and by subsequently releasing these communications to the press under the guise of responding to a FOIA request.[14]

Because the defamatory statement claims that Bright, as an employee of the CAPC, was having an affair with Moon, an appointed commissioner of the CAPC, there is a "nexus between the allegedly defamatory statement . . . and [Bright's] employment by the [CAPC]." *Low*, 128 Cal. Rptr. 2d at 428. The TAC makes clear that these allegations were made "in furtherance of [Eureka Defendants'] efforts to remove" Bright from his employment with the CAPC. (Doc. 50-2, p. 13). That is, the statements were made to preemptively justify the planned termination of Bright and Moon's employment—a personnel decision. *See Peterborough*, 397 F. Supp. 2d at 238. And there is no allegation or evidence that Wright and Bright had any relationship outside the context of their work for the CAPC that would otherwise motivate these statements. *Low*, 128 Cal. Rptr. 2d at 428. Any injury alleged from this defamation arose out of an employment-related practice, and, thus, the Court finds that coverage for the defamation alleged in Cause of Action No. 7 is excluded under the ERP Exclusion. To the extent Bright seeks relief for injuries under a theory of false light, such injuries arise out of a privacy violation and are excluded from coverage. *See* Doc. 50-1, pp. 68, 76. Accordingly, there is no possibility of coverage for Cause of Action No. 7.

### 7.    *Cause of Action No. 8: No Coverage Because It Is a Privacy Claim*

Cause of Action No. 8 seeks relief for the intentional torts of intrusion, false light, and invasion of privacy for Wright's communications to Detective Brooks regarding

---

[14] Cause of Action No. 7: "The Intentional Torts of Defamation/Libel and Slander and False Light; A Claim by Rick Bright Against Carol Wright Individually and in Her Official Capacity" (Doc. 50-2, p. 62).

Bright.[15] The Policy's amended definition of "personal and advertising injury" explicitly excludes injuries that arise out of "oral or written publication, in any manner, of material that violates a person's right of privacy." (Doc. 50-1, pp. 68, 76). Thus, there is no possibility of coverage here.

### 8. Cause of Action No. 9: No Coverage Under the ERP Exclusion

Cause of Action No. 9 is premised on the allegation that Wright gave Bright a poor performance evaluation and then released the evaluation to the press under the guise of responding to a FOIA request.[16] The TAC alleges that these actions were in retaliation against Bright for notifying certain commissioners that Lacy Ekberg—a close friend of Wright's—was not coming to work or performing her duties. Bright claims that, in retribution, Wright "authored a document that resulted in [ ] Bright being placed on probation" and filled out a negative performance evaluation. (Doc. 50-2, p. 67). The performance evaluation allegedly included accusations that Bright was shifting money, lacked focus, was disloyal to the CAPC, was insubordinate, and had conflicting interests, among other similar claims. *Id.* at pp. 67–68. Allegedly Wright then released this evaluation in response to a FOIA request from the press, despite it not being responsive to the request, and portions of the evaluation were published in a local newspaper. *Id.* at p. 68.

---

[15] Cause of Action No. 8: "The Intentional Tort of Intrusion/ False Light/ Invasion of Privacy[;] A Claim by Rick Bright Against Carol Wright[,] Both Individually and in Her official Capacity as a CAPC Commissioner" (Doc. 50-2, p. 64).

[16] Cause of Action No. 9: "Intentional Torts of Defamation/ Libel and Slander and Violation of A.C.A. §§ 25-19-104, 105[;] A Claim by Rick Bright Against Carol Wright" (Doc. 50-2, p. 66).

Wright's actions in emailing fellow commissioners, having Bright placed on probation, completing a negative performance evaluation, and publishing said evaluation to third parties all fall under the ERP Exclusion. The statements were made in the context of Bright's employment with the CAPC and his actions within his role. There is no evidence that Bright had a relationship with Wright outside their positions on the CAPC. *See Low*, 128 Cal. Rptr. 2d at 428. The defamatory statements were accompanied by a personnel decision to put Bright on probation, and the evaluation, by its very nature, was employment related. *See Peterborough*, 397 F. Supp. 2d at 238. In fact, according to State-Court Plaintiffs' argument, this is precisely the type of instance that would qualify as employment-related defamation: an internal evaluation related to work performance that is released to third parties. *See* Doc. 57, p. 18 (arguing that the ERP Exclusion is reasonably "more likely meant to cover" situations where an employer communicates constructive criticism to a person "but, for reasons unintended or incidental to the communication come into possession of a third party"). Accordingly, because these alleged injuries arose out of an employment-related practice, there is no possibility of coverage.

### 9.    *Cause of Action No. 10: No Coverage by Concession of All Parties*

The parties agree that the Policy does not cover any injuries arising out of the alleged conduct in Cause of Action No. 10.[17] *See* Doc. 57, p. 8 (State-Court Plaintiffs'

---

[17] Cause of Action No. 10: "Negligent Hiring/ Appointment and Failure to Properly Investigate and Vett [sic] Carol Wright for Appointment to the Position of Commissioner of the Eureka Springs City Advertising and Promotion Commission, a Claim of all Plaintiffs Both Against Butch Berry, Individually and in His Official Capacity" (Doc. 50-2, p. 70).

concession); Doc. 64, ¶ 4 (Eureka Defendants admitting to State Auto's statement of fact that there is no coverage). Accordingly, there is no coverage for these claims.

**10.    Cause of Action No. 11: No Coverage Under the ERP Exclusion and/or the Criminal Acts Exclusion**

Cause of Action No. 11 alleges that certain Eureka Defendants defamed certain State-Court Plaintiffs.[18] More specifically, this Cause of Action alleges that Wright defamed Rambo, Johnson, Bright, and Pryor by sending an email to Detective Brooks that stated or implied that these State-Court Plaintiffs "allowed businessmen from the community to dictate how the CAPC office would be run, . . . allowed these local businessmen access to files and computers at the CAPC, and . . . allowed [these businessmen] to [harass CAPC employees]," (Doc. 50-2, p. 74), along with other similar statements. The TAC then alleges that Wright sent this same communication to the editor of a local newspaper nearly a year later. *Id.* at p. 73. According to the TAC, Green then filed a false police report, "at Carter[']s urging," that "echo[ed]" the statements made by Wright. *Id.* at p. 74. The existence of the police report and the statements were later published in local newspapers. *Id.* at pp. 75–75. Finally, the TAC alleges that Carter made similar accusations in his January 27 and February 5 meetings, and that Berry made similar accusations to Councilwoman Slane on April 5. *Id.* at p. 75.

The statements alleged in this Cause of Action fall within the ERP Exclusion. They were made about State-Court Plaintiffs' performance within their roles as employees of

---

[18] Cause of Action No. 11: "The Intentional Torts of Defamation/ Libel and Slander[;] A Claim by Johnson, Rambo, Moon, Bright, and Pryor Against Berry, Wright, Jeff Carter, Green, and Meyer Both Individually and in Their official Capacities" (Doc. 50-2, p. 73). Though this Cause of Action states that it is a claim brought by Johnson, Rambo, Moon, Bright, and Pryor, none of the allegations pled in this Cause of Action involve Moon.

the CAPC, and thus have a close nexus to State-Court Plaintiffs' employment. *See Low*, 128 Cal. Rptr. 2d at 428. There is no evidence that there were any outside relationships between those making the statements therein and those at whom the statements were directed. *Id.* And, as with the other allegations of defamation thus far, these statements were made within the context of discrediting State-Court Plaintiffs' competence and ethics as a means of justifying their termination from the CAPC. *See Peterborough*, 397 F. Supp. 2d at 238. This is a sufficient connection for this cause of action to fall within the ERP Exclusion. To the extent this Cause of Action relies on Green's alleged filing of a false police report, that would be excluded under the Criminal Acts Exclusion. *See infra* Section IV.A.12 (discussing Cause of Action No. 13). Because this coverage for injuries under this Cause of Action is barred under the ERP Exclusion and, in part, under the Criminal Acts Exclusion, there is no possibility of coverage.

### 11.    *Cause of Action No. 12: No Coverage Under the ERP Exclusion and/or the Criminal Acts Exclusion*

Cause of Action No. 12 alleges that Green and Carter defamed Rambo, Johnson, Bright, and Pryor by filing a false police report that accused these State-Court Plaintiffs of engaging in "the crime of theft of business."[19] The TAC alleges that these statements were then published to other members of the community and the press. (Doc. 50-2, p. 77). Based on the Court's determination as to Cause of Action No. 11, *supra*, to the extent the statements that formed the basis of the police report constituted defamation, they are barred under the ERP Exclusion. And, pursuant to the Court's determination as to Cause

---

[19] Cause of Action No. 12: "The Intentional Tort of Defamation, Libel and Slander[;] A Claim of Rambo, Johnson, Bright and Pryor Against Melissa Greene and Jeff Carter[,] Both Individually and in Their Official Capacities" (Doc. 50-2, p. 76).

of Action No. 13, *infra*, the actions that form the basis of Cause of Action No. 12—i.e., filing a false police report—were criminal acts. Coverage for such injuries resulting from the allegedly false report would be barred under the Criminal Acts Exclusion. Accordingly, there is no possibility of coverage for this claim.

### 12. Cause of Action No. 13: No Coverage Under the Criminal Acts Exclusion

State-Court Plaintiffs bring a claim for negligence on the allegation that Green filed a false police report and that Carter made false statements to the police, in conspiracy with other Eureka Defendants, namely Wright.[20] The TAC alleges that such actions were in violation of Arkansas Criminal Code §§ 5-54-122 and 5-3-401, which range from a Class A misdemeanor to Class D felony. The Policy explicitly excludes from coverage personal and advertising injuries that arise out of criminal acts committed by or at the direction of the insured, so any claimed injury resulting from the alleged conduct under Cause of Action No. 13 is not covered.

### 13. Cause of Action No. 14: No Coverage Under the ERP Exclusion and/or Because It Is a Privacy Claim

In Cause of Action No. 14, all State-Court Plaintiffs bring a claim of defamation and false light against Carter for his statements made at the January 27, 2021 meeting held with local citizens and businessowners, which were recorded and later published in a local newspaper.[21] (Doc. 50-2, pp. 80, 82). The TAC claims that Carter's attendance and

---

[20] Cause of Action No. 13: "Violation of a Criminal Statute as Evidence of Negligence or other Culpable Conduct[;] Filing a False Police Report and Conspiracy to File a False Police Report: A Claim of Rambo, Johnson, Bright and Pryor Against Melissa Greene and Jeff Carter" (Doc. 50-2, p. 77).

[21] Cause of Action No. 14: "The Intentional Tort of Defamation/ Libel/ Slander/ False Light, a Claim of All Plaintiffs Against Jeff Carter, Both Individually and in His Official Capacity" (Doc. 50-2, p. 79).

statements at this meeting were "[i]n furtherance of the conspiracy of the defendants to eliminate Greg Moon, take over the CAPC, and terminate the office staff." *Id.* at p. 80. It further claims that "[d]ue to the conspiratorial conduct involved . . . Moon was illegally removed as CAPC Commissioner" and the CAPC "terminated Rambo and Johnson." *Id.* at p. 82. The statements involved accusations that have already been discussed in this Order, including that the State-Court Plaintiffs were giving preferential treatment to particular businessowners, that Johnson was embezzling money from the CAPC, that Rambo had created a new budget line to spend out of, that Bright was untrustworthy on financial matters, and other similar statements. *See id.* at pp. 80–82.

To the extent the statements alleged here are defamatory, coverage for any resulting injuries would be barred under the ERP Exclusion. The statements had a close nexus to State-Court Plaintiffs' roles within the CAPC. *Low*, 128 Cal. Rptr. 2d at 428. The context and explicit pleadings demonstrate that these statements were made to justify the Eureka Defendants' imminent actions to remove Moon and other CAPC employees, thereby tying them to a planned personnel decision. *See Peterborough*, 397 F. Supp. 2d at 238. Further, there is no evidence or allegation that Carter had an outside relationship with State-Court Plaintiffs that could provide an alternative context or purpose for these statements. *Low*, 128 Cal. Rptr. 2d at 428. Thus, any injuries that arose out of the alleged defamation arose out of an employment-related practice. To the extent State-Court Plaintiffs seek relief for injuries under a theory of false light, such injuries arise out of privacy violations and are excluded from coverage. *See* Doc. 50-1, pp. 68, 76. Therefore, there is no possibility of coverage for the claims alleged in this Cause of Action.

**14. Cause of Action No. 15: No Coverage Because No Personal or Advertising Injury and/or the ERP Exclusion Applies**

Cause of Action No. 15 claims that certain Eureka Defendants committed the tort of negligence as evidenced by their violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-101 *et seq.*[22] More specifically, the TAC alleges that Eureka Defendants employed a bait-and-switch tactic with Johnson's hiring and employment, resulting in her losing status and/or pay. (Doc. 50-3, p. 3). The Court does not see how these allegations fall within the coverage of the policy, as there is no personal or advertising injury alleged here. Further, to the extent any personal or advertising injury were alleged, this Cause of Action revolves entirely around the employment-related practices of the CAPC, namely termination and/or employment-related coercion or demotion. *See Low*, 128 Cal. Rptr. 2d at 428; *Peterborough*, 397 F. Supp. 2d at 238. There is no possibility of coverage for the harm alleged in this cause of action.

**15. Cause of Action No. 16: No Coverage Because No Personal and Advertising Injury Alleged and/or the ERP Exclusion Applies**

Cause of Action No. 16 alleges that certain Eureka Defendants committed fraud, injuring Rambo and Johnson.[23] More specifically, the TAC claims that representations were made that Rambo had authority to hire Johnson, but after Rambo and Johnson reasonably relied on those representations, they were fired. (Doc. 50-3, p. 6). Again, the

---

[22] Cause of Action No. 15: "A Claim for the Violation of the Arkansas Deceptive Trade Practices Act and a Claim For Negligence, a Claim by Plaintiffs Gina Rambo and Tracy Johnson Against Defendants Berry, Wright, Carter, the City and the CAPC" (Doc. 50-3, p. 1).

[23] Cause of Action No. 16: "Fraud, Actual or Constructive[;] A Claim by Gina Rambo and Tracy Johnson Against The City of Eureka Springs, The Eureka Springs CAPC, Butch Berry, Carol Wright and Jeff Carter[,] Individually and/or in Their Official Capacities" (Doc. 50-3, p. 5).

Court does not see how the injuries alleged in this Cause of Action constitute personal or advertising injuries as defined in the Policy, and State-Court Plaintiffs have not provided argument on this. Further, to the extent personal or advertising injury is alleged here, it falls squarely within the ERP Exclusion, as such injuries allegedly arose out of termination of employment and employment-related acts such as coercion. *See* Doc. 50-1, p. 99. Accordingly, there is no possibility of coverage for this claim.

### 16. Causes of Action Nos. 17 and 18: No Coverage Under Breach of Contract Exclusion and/or the ERP Exclusion

Causes of Action Nos. 17 and 18 make claims for breach of contract, reinstatement, and constructive termination related to Rambo, Johnson, Bright, and Pryor's employment with the CAPC.[24] Cause of Action No. 17 alleges that, as a result of Moon's removal, Rambo and Johnson were "ostensibly fired" in violation of the law. (Doc. 50-3, pp. 7–9). The TAC claims this illegal firing violated the terms of their employment as laid out in the employee handbook. *Id.* Cause of Action No. 18 pleads breach of contract based upon the constructive termination of Bright and Pryor following the termination of Johnson and Rambo. *Id.* at pp. 9–11.

To the extent these causes of action arise out of breach of contract, coverage is explicitly barred under the policy, which excludes personal and advertising injuries "[a]rising out of a breach of contract." *See* Doc. 50-1, p. 61. Moreover, these claims fall

---

[24] Cause of Action No. 17: "Breach of Contract, or, Alternatively, a Claim for Reinstatement, a Claim of Rambo and Johnson Against the City, the CAPC, Berry, Wright, Carter, Greene, Meyer and DeVito, Individually and in Their Official Capacities" (Doc. 50-3, p. 7).

Cause of Action No. 18: "Constructive Termination, Breach of Contract[;] A Claim of Rick Bright and Karen Pryor Against Berry, Wright, Carter, Greene, Meyer, Burnett and DeVito[,] The CAPC and The City of Eureka Springs" (Doc. 50-3, p. 9).

squarely within the ERP Exclusion, which excludes coverage for personal or advertising injury "arising out of any . . . [t]ermination of that person's employment." *See id.* at p. 99. Therefore, there is no possibility of coverage under the Policy for Causes of Action Nos. 17 and 18.

### 17.  Cause of Action No. 19: No Coverage Because Recovery for Civil Conspiracy Relies on Damages for Injuries That Are Not Covered

Cause of Action No. 19 alleges that Eureka Defendants engaged in a conspiracy to gain control of the CAPC and eliminate State-Court Plaintiffs by taking the various actions detailed throughout the TAC.[25] "A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy." *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 961 (2002) (citations omitted). That is, under Arkansas law, recovery for the conspiracy alleged depends on the damages caused by acts committed pursuant to the conspiracy.

The alleged conspiracy is predicated on actions that the Court has found in this Order to have no possibility of coverage. A plaintiff can only recover on a claim of civil conspiracy for the damages caused by the *acts committed* pursuant to the conspiracy. Therefore, to the extent the underlying acts are barred from coverage, so is the conspiracy because State-Court Plaintiffs' recovery for conspiracy is wholly dependent on the commission of the alleged acts—all of which are excluded.

---

[25] Cause of Action No. 19: "Conspiracy to Gain Control of the Eureka Springs CAPC, To Stack the CAPC With Appointees of Their Choosing and to Eliminate the Plaintiffs by Engaging in Defamatory Conduct/ Libel/ Slander/ False Light and by Violating Arkansas' Criminal Law, A Claim of All Plaintiffs Against Berry, Carter, Wright, Greene, DeVito, Meyer and Burnett, In Their Individual and official Capacities" (Doc. 50-3, p. 11).

18. *Cause of Action No. 20: No Coverage Under the Criminal Acts Exclusion*

State-Court Plaintiffs allege that Berry, Carter, Wright, Green, DeVito, and Meyer committed the tort of negligence as evidenced by their abuse of office and corruption in violation of Arkansas Code § 5-52-107.[26] Abuse of public office under § 5-52-107 can range from a Class A misdemeanor to a Class B felony. Because the Policy explicitly excludes "personal and advertising injury" that arises out of criminal acts committed by or at the direction of the insured, there is no possibility of coverage for any claimed injury resulting from the alleged conduct under Cause of Action No. 20.

19. *Cause of Action No. 21: No Coverage Under the ERP Exclusion*

Cause of Action No. 21 brings a claim for defamation against Ekberg, Carter, and Green on behalf of Rambo, Johnson, Bright, and Pryor.[27] The core of the allegations in this claim relates to the April 30, 2020 email from Ekberg to Carter, on which Green's allegedly false police report was later based. (Doc. 50-3, p. 27). This email allegedly claimed that State-Court Plaintiffs were allowing CAPC business to be "routed to outside businesses." *Id.*[28] Allegedly, Carter then shared this information with Green, who—at Carter's request—filed a police report. *Id.*

---

[26] Cause of Action No. 20: "Corruption in Public Office/ Abuse of Office[;] A Claim of Negligence Based Upon Violation of An Arkansas Criminal Statute, A.C.A. § 5-52-107[;] a Claim by Moon, Rambo, Johnson and Bright Against Berry, Carter, Wright, Green, DeVito and Meyer" (Doc. 50-3, p. 21).

[27] Cause of Action No. 21: "The Intentional Tort of Defamation/ Libel and Slander[;] A Claim by Rambo, Johnson, Bright and Pryor Against Lacy Ekberg, Jeff Carter and Melissa Green, Individually and in Their Official Capacities" (Doc. 50-3, p. 26).

[28] The Court's understanding is that—at a high level—this included giving outside local businessowners improper access to CAPC computers and information.

The Court has already addressed the statements that are the basis of this claim in its discussion of Causes of Action Nos. 11, 12, and 13. These statements were made about State-Court Plaintiffs' performance of their roles with the CAPC in order to discredit them and justify their termination. Accordingly, coverage for injuries for Cause of Action No. 21 is barred under the ERP Exclusion.

### 20.  Causes of Action Nos. 22 and 23: No Coverage Because They Are Privacy Claims and/or Fall Under the Disclosure of Personal Information Exclusion

Causes of Action Nos. 22 and 23 allege that certain Eureka Defendants violated the Arkansas FOIA and committed the tort of invasion of privacy by publicly disclosing private and confidential information that is exempted from FOIA mandates.[29] Such information allegedly included dates of birth, phone numbers, addresses, direct deposit information, copies of driver's licenses, and marital status.

Under the Policy, injury arising out of "oral or written publication, in any manner, of material that violates a person's right of privacy" does not fall within coverage. (Doc. 50-1, pp. 68, 76). Further, the Policy excludes "personal and advertising injury" "[a]rising out of any . . . disclosure of any person's . . . confidential or personal information, including . . . financial information, credit card information, health information, or any other type of nonpublic information." Id. at p. 101. Per the definition of "personal and advertising injury" and the Disclosure of Personal Information Exclusion, there is no possibility of coverage for this claim.

---

[29] Cause of Action Nos. 22 & 23: "Violations of Freedom of Information Act And The Tort of Invasion of Privacy by Revealing Public Disclosure of Personal, Private Confidential Excluded Information, A Claim of Plaintiffs Greg Moon, Gina Rambo, Tracy Johnson, Rick Bright and Karen Pryor Against Kim Stryker[,] Carol Wright And The City of Eureka Springs, Arkansas" (Doc. 50-3, p. 29).

### 21.  *Cause of Action No. 24: Issue of Coverage Not Applicable*

The final cause of action in the TAC is a direct action against State Auto under Arkansas Code § 23-79-210, and, thus, the issue of coverage is not in question.

\* \* \*

In sum, because the TAC alleges no claim for which there is a possibility of coverage, State Auto has no duty to defend the underlying action, as a matter of law.

### B.  Duty to Indemnify

"[T]he duty to defend is broader than the duty to indemnify." *Murphy Oil*, 61 S.W.3d at 812. Because the Court finds that there is no possibility of coverage as to any of the causes of action alleged in the TAC, State Auto "certainly cannot have a duty to indemnify based on any of the same claims." *Landers Auto Grp. No. One, Inc.*, 621 F.3d at 815. Accordingly, the Court finds State Auto has no duty to indemnify Eureka Defendants.

### V.  CONCLUSION

State Auto Policy No. 1000368247 provides no coverage for the underlying claims alleged by State-Court Plaintiffs, and thus, State Auto has no duty to defend or indemnify the Eureka Defendants in the underlying action. Therefore, **IT IS HEREBY ORDERED** that State Auto's Motion for Summary Judgment (Doc. 50) is **GRANTED**. Judgment will enter contemporaneously with this Opinion, and the case is **DISMISSED**.

**IT IS SO ORDERED** on this 15th day of November, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE